## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

DM, a minor child, by and through his natural parents )
and guardians, EVONA MOSS and JESSE MOSS, and )
MAH and BTH, minor children, by and through their )
natural mother and guardian, EVONA MOSS, )
 )
                Plaintiffs, )
 )
v. )      No. 03-CV-565 H(C)
 )
ASARCO INCORPORATED, BLUE TEE CORPORATION, )
GOLD FIELDS MINING CORPORATION, NL )
INDUSTRIES INCORPORATED, CHILDRESS ROYALTY )
COMPANY, THE DOE RUN CORPORATION, ORE & )
MINERAL RECOVERY, INCORPORATED, and )
RJJ, INCORPORATED, )
 )
      Defendants/Third Party Plaintiffs, )
 )
v. )
 )
UNITED STATES OF AMERICA, EAGLE-PICHER )
INDUSTRIES, INC., and BURLINGTON NORTHERN )
AND SANTA FE RAILWAY COMPANY, )
 )
       Third Party Defendants. )

F I L E D

OCT 0 4 2004

Phil Lombardi, Clerk
U.S. DISTRICT COURT

## AMENDED THIRD PARTY COMPLAINT OF DEFENDANTS THE DOE RUN RESOURCES CORPORATION, ASARCO CORPORATION, GOLD FIELDS MINING CORPORATION AND BLUE TEE CORP.

COME NOW Defendants/Third Party Plaintiffs The Doe Run Resources Corporation

("Doe Run"), Asarco Corporation ("Asarco"), Gold Fields Mining Corporation ("Gold Fields")

and Blue Tee Corp. ("Blue Tee") and, denying all liability to Plaintiffs, for their Amended Third

Party Complaint against Third Party Defendants the United States of America, Eagle-Picher

Industries, Inc. ("Eagle-Picher"), and Burlington Northern and Santa Fe Railway Company

("BNSF") state as follows:

## Count I – Against the United States

1.      Plaintiffs B.T.H. and M.A.H.[1] allege that they are residents of Picher, Oklahoma.

2.      Defendant/Third Party Plaintiff Doe Run is a New York Corporation. Defendant/Third Party Plaintiff Asarco is a New Jersey Corporation. Defendants/Third Party Plaintiffs Blue Tee and Gold Fields are Delaware Corporations.

3.      This Court has subject matter jurisdiction of this action because the parties to the Petition who have properly been joined and served are of diverse citizenship and the amount in controversy exceeds $75,000, as stated in the Notice of Removal filed in this action. This Third Party Complaint falls within the Court's supplemental jurisdiction under 28 U.S.C. § 1367. This Count I also falls within the Court's jurisdiction under 28 U.S.C. § 1346(b)(1).

4.      Plaintiffs filed a Petition in Ottawa County District Court seeking judgment against Defendants/Third Party Plaintiffs on claims of negligence, strict liability, and nuisance. A copy of the Petition is attached hereto as Exhibit A. That action was properly removed to this Court.

5.      At all relevant times, the United States, through its agents and employees (including those at the Department of Interior, Bureau of Indian Affairs and the Bureau of Mines) acted as described below.

6.      All conditions precedent to this action have been performed or have occurred.

7.      Tar Creek is a mining site approximately forty square miles located in Northeast Oklahoma. In the period from 1891 until about 1970, hundreds of companies mined zinc and lead, along with other minerals, at Tar Creek. The region became one of the most productive zinc and lead mining districts in the United States.

---

[1] This action was originally brought on behalf of three Plaintiffs. The claims of one Plaintiff, DM, have been dismissed.

8.      Some or all of the properties involved in this action were, at times relevant to this action, within the boundary of the Quapaw Indian Reservation, and were lands allotted to members of the Quapaw Indian Tribe and held in trust by the United States of America.

9.      Quapaw members could lease their land for mining purposes pursuant to authority granted by the United States Congress in 1897. Certain Quapaws were deemed incompetent ("restricted Quapaws") and leases were made on their behalf by the United States. These restricted Quapaws had no power to veto leases made by the United States. Said restricted Quapaws were nonetheless beneficiaries of the leases in this time period, during which the United States owed to them one or more fiduciary duties.

10.     As the lessor of restricted Quapaw lands for mining, the United States was a major participant in the development of the Tar Creek mining site. Under 25 U.S.C. § 102, the United States, through the Department of Interior had the responsibility for approving and managing mineral leases of land belonging to the restricted Quapaws.

11.     Under these leases, the United States, through its agents and employees, exercised comprehensive authority and control over the production of lead ores from these properties, as well as the treatment, storage, and other handling of the ores and ore byproducts. The United States was active in supervising the operation of the mining leases at issue.

12.     One of the byproducts of lead mining is a substance called "chat".

13.     Under the leases, ownership of the chat or other mining byproducts resulting from mining operations was specifically retained by the landowners.

14.     The United States effectively maintained control over a substantial portion of the mining byproducts in Ottawa County.

3

15.     Each Defendant/Third Party Plaintiff denies that it, or any of its predecessors, owed any duties to Plaintiffs. However, to the extent any mine operator would owe such duties to the Plaintiffs, then the United States would owe Plaintiffs those same duties. Among those duties would be a duty to warn residents of Ottawa County of potential harms from mining byproducts, and a duty to protect the residents of Ottawa County.

16.     The United States, by and through its employees, negligently failed to supervise and manage the Tar Creek site, and specifically failed to fulfill its obligations to manage and supervise leasing, mining, milling and chat sales operations.

17.     While still denying that they owe duties to the Plaintiffs as alleged in the Petition, Defendants/Third Party Plaintiffs state that if they did owe such duties then the United States also had duties to Plaintiffs, including as lessor of Quapaw lands, the duty to warn Plaintiffs and to protect Plaintiffs from alleged harms from lead and/or lead mining byproducts. The United States breached these duties by failing to warn and/or protect residents of Ottawa County.

18.     Plaintiffs' injuries, if any, were caused in whole or in part by the acts or omissions of the United States.

19.     Under the Federal Tort Claims Act, 28 U.S.C. § 2674, the United States is held liable in accordance with the law of the place where the act or omission occurred from the kinds of harm alleged by Plaintiffs.

20.     Under Okla. Stat. Ann. tit. 12, § 832 and Oklahoma common law, Defendants/Third Party Plaintiffs are entitled to contribution from the United States against any damages recovered by Plaintiffs.

WHEREFORE, Defendants/Third Party Plaintiffs, severally, pray judgment against Third Party Defendant United States in the amount of any payment any Defendant/Third Party Plaintiff

might be required to make to Plaintiffs in excess of that Defendant/Third Party Plaintiff's

appropriate share, plus interest and costs of suit.

### Count II – Against Eagle-Picher Industries, Inc.

21.    Defendants/Third Party Plaintiffs incorporate by reference as if fully set out here

the allegations of paragraphs 1 through 20 of this Amended Third Party Complaint.

22.    Plaintiffs have sued Defendants/Third Party Plaintiffs on theories of negligence,

strict liability and nuisance. Defendants/Third Party Plaintiffs and each of them deny that any

activities carried on by any of them was negligent, created liability under any theory of strict

liability, or created a nuisance, or that Plaintiffs were damaged by any activities of any

Defendant/Third Party Plaintiff. Pleading hypothetically and in the alternative, however, each

Defendant and Third Party Plaintiff states that if that Defendant/Third Party Plaintiff is liable to

Plaintiffs then that Defendant/Third Party Plaintiff is entitled to recovery over from Eagle-Picher

Industries, Inc. for the reasons set forth in this Count II.

23.    It is Plaintiffs' pleaded theory that actions of Defendants/Third Party Plaintiffs

and their alleged predecessors in the conduct of mining operations in Ottawa County, including

mining, milling and the handling of chat and tailings resulting from those activities were

negligent, gave rise to strict liability, created a nuisance and injured Plaintiffs.

24.    Eagle-Picher and/or its predecessors in interest engaged in mining, milling and

other activities in Ottawa County, Oklahoma, from 1914 through the cessation of active mining

activities in Ottawa County around 1970, and thereafter.

25.    In the course of such activities, Eagle-Picher and/or its predecessors in interest

acquired numerous mining leaseholds, found, developed and operated numerous mines and mills

for the production of zinc and lead concentrates. The size of its operations, and volume of ore,

concentrates, chats and tailings produced and handled by Eagle-Picher and its predecessors was

greater than the size and volume of operations of all the Plaintiffs/Third Party Defendants

individually or combined.

26.     While denying liability to Plaintiffs, If Defendants/Third Party Plaintiffs are liable

to Plaintiffs because they conducted mining, milling and the handling of chat and tailings and so

damaged Plaintiffs, then Eagle-Picher is liable to Plaintiffs on the same basis. ·

27.     Under Okla. Stat. Ann. tit. 12, § 832 and Oklahoma common law,

Defendants/Third Party Plaintiffs are severally entitled to contribution from Eagle-Picher against

any damages recovered by Plaintiffs.

WHEREFORE, Defendants/Third Party Plaintiffs, severally, pray judgment against

Defendant Eagle-Picher Industries, Inc. in the amount of any payment any Defendant/Third Party

Plaintiff might be required to make to Plaintiffs in excess of that Defendant/Third Party

Plaintiff's appropriate share, plus interest and costs of suit.

### Count III – Against Burlington Northern and Santa Fe Railway Company

28.     Defendants/Third Party Plaintiffs incorporate by reference as if fully set out here

paragraphs 1 through 27 of this Amended Third Party Complaint.

29.     Third Party Defendant BNSF is a Delaware corporation with its principal place of

business in the State of Texas.

30.     BNSF is the owner and operator of a railroad system in the western United States,

including Oklahoma.  It is also the successor to various other railroad companies, including

St. Louis and San Francisco Railway Company and the Northeast Oklahoma Railroad Company.

31.     Plaintiffs in this action have sued the Defendants/Third Party Plaintiffs on

theories of negligence, nuisance and strict liability.  Defendants/Third Party Plaintiffs, and each

of them, deny that any activities carried on by any of them was negligent, created liability under any theory of strict liability, or created a nuisance, or that Plaintiffs were damaged by any activities of any Defendant/Third Party Plaintiff. Pleading hypothetically and in the alternative, however, each Defendant and Third Party Plaintiff states that if that Defendant/Third Party Plaintiff is held liable to Plaintiffs, then that Defendant/Third Party Plaintiff is entitled to recovery over from BNSF for the reasons set forth in this Count III.

32.     The activities of Defendants/Third Party Plaintiffs that allegedly give rise to this liability include the mining and milling of ore, the creation of chat and tailings piles, and the movement of chat and tailings around mining sites. Defendants/Third Party Plaintiffs are alleged to have sold chat as railroad ballast and for other purposes.

33.     Defendants/Third Party Plaintiffs deny that they or any of their alleged predecessors engaged in any activity giving rise to liability to Plaintiffs. In the alternative, however, Defendants/Third Party Plaintiffs state that if any of them engaged in any activity giving rise to such liability, then Third Party Defendant BNSF and its predecessors for whose activities BNSF is liable, including St. Louis and San Francisco Railway Company and the Northeast Oklahoma Railroad Company, also engaged in activities giving rise to liability to Plaintiffs, including:

(a)     the movement of chat and tailings on railroad lines operated by them in and around the towns of Picher and Cardin; and

(b)     the use of chat for railroad purposes, including the use of chat as ballast on railroad beds maintained by them in and around the towns of Picher and Cardin.

34.    Under Okla. Stat. Ann. tit. 12, § 832 and Oklahoma common law,

Defendants/Third Party Plaintiffs are entitled to contribution from BNSF against any damages

recovered by Plaintiffs.

WHEREFORE, Defendants/Third Party Plaintiffs, severally, pray judgment against

Defendant Burlington Northern and Santa Fe Railway in the amount of any payment any

Defendant/Third Party Plaintiff might be required to make to Plaintiffs in excess of that

Defendant/Third Party Plaintiff's appropriate share, plus interest and costs of suit.

**HALL, ESTILL, HARDWICK, GABLE,
GOLDEN & NELSON, P.C.**

By:_____

T. Lane Wilson, OBA #16343
Karissa K. Waterbury, OBA #20126

320 South Boston Avenue, Suite 400
Tulsa, OK 74103-3708
Telephone: (918) 594-0400
Facsimile: (918) 594-0505

and

**LEWIS, RICE & FINGERSH, L.C.**

Richard A. Ahrens
Robert J. Will
C. David Goerisch
500 North Broadway, Suite 2000
St. Louis, Missouri 63102
Telephone: (314) 444-7600
Facsimile: (314) 241-6056

ATTORNEYS FOR DEFENDANT
THE DOE RUN RESOURCES
CORPORATION

8

**DOERNER, SAUNDERS, DANIEL
& ANDERSON, L.L.P.**

William C. Anderson
G. Michael Lewis
Linda C. Martin
Russell W. Kroll
320 South Boston Avenue, Suite 500
Tulsa, OK 74103-3725
Telephone: (918) 591-5394
Facsimile: (918) 925-5314

ATTORNEYS FOR DEFENDANT
ASARCO


**JOYCE, PAUL & McDANIEL, P.C.**

Robert J. Joyce, OBA #12728
Chris A. Paul, OBA #14416
A. Scott McDaniel, OBA #16460
Stacy L. Acord, OBA #18633
Jon M. Payne, OBA #17910
1717 S. Boulder, Suite 200
Tulsa, OK 74119
Telephone: (918) 599-0700
Facsimile: (918) 732-5370

**SHOOK, HARDY & BACON, L.L.P.**

Stanley D. Davis
Mark D. Anstoetter
Kirk F. Marty
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: (816) 474-6550
Facsimile: (816) 421-5547

ATTORNEYS FOR DEFENDANTS BLUE
TEE CORP. AND GOLD FIELDS
MINING CORPORATION

443370.1:312345:00360

## CERTIFICATE OF MAILING

I, the undersigned, do hereby certify that on the ___ day of October, 2004, a true and correct copy of the above and foregoing Amended Third Party Complaint was forwarded via U.S. Mail to the following counsel of record:

Charles F. Speer
Speer Law Firm, P.A.
The Stilwell Building
104 West 9th, Suite 305
Kansas City, MO 64105

Christopher A. Seeger
Seth Katz
Seeger, Weiss LLP
One William Street
New York, NY 10004-2502

Tony Edwards
Anthony Laizure
Stipe Law Firm
P.O. Box 1369
McAlester, OK 74502-1369

Robert F. Kennedy, Jr.
Kevin J. Madonna
Kennedy & Madonna
109 Mountain Laurel Lane
Woodstock, NY 12498

Steven M. Talson
Jason S. Patil
U.S. Department of Justice
Civil Division, Torts Branch
Environmental Torts Section
P.O. Box 340
Benjamin Franklin Station
Washington, DC 20044

_____

471437.1:312345:00360



IN THE DISTRICT COURT IN AND FOR OTTAWA COUNTY
STATE OF OKLAHOMA

█████ MOSS, a minor child, by and through his
natural parents and guardians, EVONA MOSS and
JESSE MOSS, and █████████ HUSTON and
█████████ HUSTON, minor children, by and
through their natural mother and guardian, EVONA
MOSS,

        Plaintiffs,

    v.

ASARCO INCORPORATED, a Foreign Corporation;
BLUE TEE CORPORATION, a Foreign Corporation;
GOLDFIELDS MINING CORPORATION, a Foreign
Corporation, NL INDUSTRIES INCORPORATED, a
Foreign Corporation; CHILDRESS ROYALTY
COMPANY, a Foreign Corporation; THE DOE RUN
CORPORATION, a Foreign Corporation; ORE &
MINERAL RECOVERY, INCORPORATED, a Foreign
Corporation; and RJJ, INCORPORATED, an
Oklahoma Corporation.

        Defendants.

Case No. CJ-03-339

JURY TRIAL REQUESTED

FILED
DISTRICT COURT
OTTAWA CO. OKLA.

JUL 2 9 2003

BEVERLY STEPP COURT CLERK
BY_____

## PETITION

Come now Plaintiffs █████ MOSS, a minor child, by and through his natural

parents and guardians, EVONA MOSS and JESSE MOSS, and █████ 

HUSTON and █████ HUSTON, minor children, by and through their

natural mother and guardian, EVONA MOSS, and file this Complaint seeking judgment

against the above named Defendants, in support thereof states as follows:

I.    NATURE OF THE ACTION



1.      This is a personal injury action for lead exposure injuries suffered by the infant Plaintiffs. These lead-related injuries are a direct result of lead mining wastes deposited by the mining company Defendants in the Picher-Cardin area. These same lead wastes are used for commercial purposes by the remaining Defendants; RJJ, Incorporated and Ore & Mineral Recovery Incorporated.

2.      For over a century, mining companies extracted billions of dollars of lead from Picher-Cardin and the surrounding area with deliberate indifference to public health, especially the health of local children.

3.      The mining company Defendants were a major source of the contamination deposited in the area. The remaining Defendants continued to use this waste for business purposes, aggravating and spreading the contamination throughout the area. These defendants traded public health for profit by intentionally, knowingly, and systematically exposing infant Plaintiffs to dangerous levels of lead.

4.      Lead is a poison. Chronic exposure to the ingestion of lead is particularly dangerous to young children who more readily absorb lead into the bloodstream. Lead causes Intelligence Quotient ("IQ") and attention-span deficits, renal disease, and other cognitive, behavioral, cardiovascular, reproductive and neurological disorders. In an article published in December 2000 by the U.S. Department of Health and Human Services, the authors reported that every 1 part per million increase in blood lead level causes a measurable decrement in math and reading scores, numerical reasoning, and short-term memory scores. As a result of Defendants' actions, children, such as Plaintiffs, recreate, attend school, and play on school playgrounds, and reside in homes that are suffused with lead. Furthermore, approximately 50 million tons of lead wastes (*i.e.*, mining tailings) left

2

over from the Defendants' mining operations are present in the area. These mine tailings, often referred to as chat, were deposited in hundreds of piles and ponds at the site and contain high concentrations of lead. Some of the tailing piles approach 200 feet in height and constitute an attractive play area to neighborhood children. Because of Defendants' actions and omissions, Plaintiffs have suffered severe injuries from lead exposure.

III.   PARTIES

6.   Plaintiffs ████ MOSS, ███████████ HUSTON and ████ ████ HUSTON are residents of Picher, Oklahoma.

7.   Defendant Asarco, Inc. ("Asarco") is a wholly owned subsidiary of Grupo S.A. de C.V. Asarco's headquarters is in Phoenix, Arizona. Asarco's operations in Ottawa County were conducted under the name Federal Mining and Smelting Company. Asarco conducted mining and milling operations in and around the Picher-Cardin area from 1918 through 1952. According to the records of the U.S. Bureau of Mines, Asarco produced about 8,172,207 tons of crude ore from its Ottawa County operations. The processing of this ore resulted in about 7,845,319 tons of tailing disposed in and around the Picher-Cardin area, including 941,438 tons of sand size tailings, 627,625 tons of flotation tailings, and 6,276,255 tons of chat tailings. Corporation ("Blue Tee") is a Delaware Corporation. Blue Tee, formerly known as the American Zinc, Lead and Smelting Company, conducted mining and milling operations in and around the Picher-Cardin area from 1925 through 1952. According to the records of the U.S. Bureau of Mines, Blue Tee produced about 5,526,294 tons of crude ore from its Ottawa County operations. The processing of this ore resulted in about 5,305,338 tons of tailings disposed in and around the Picher-Cardin area,

including 663,167 tons of sand-sized tailings, 442,111 tons of flotation tailings, and 4,421,115 tons of chat tailings.

9.      Defendant Goldfields Mining Corporation ("Goldfields") is a Delaware Corporation. Goldfields, formerly known as the Tri-State Zinc Inc., conducted mining and milling operations in and around the Picher-Cardin area from 1927 through 1930. According to the records of the U.S. Bureau of Mines, Goldfields produced about 275.100 tons of crude ore from its Ottawa County operations. The processing of this ore resulted in about 264,096 tons of tailings disposed in and around the Picher-Cardin area, including 233,123 tons of sand-sized tailings, 22,008 tons of flotation tailings, and 220,080 tons of chat tailings10.      Defendant Childress Royalty Corporation ("Childress") is a Delaware Corporation. Childress conducted mining and milling operations in and around the Picher-Cardin area from 1929 through 1972. According to the records of the U.S. Bureau of Mines, the Childress produced about 804,674 tons of crude ore from its Ottawa County operations. The processing of this ore resulted in 772,487 tons of tailings disposed in the and around the Picher-Cardin area, including about 96,560 tons of sand-sized tailings, 64,373 tons of flotation tailings, and 643,739 tons of chat tailings.

11.      Defendant Doe Run Resources Corporation ("Doe Run") is a New York Corporation. Doe Run conducted mining and milling operations in and around the Picher-Cardin area as the Kansas Exploration Company from 1927 through 1949. According to the records of the U.S. Bureau of Mines, Doe Run produced about 1,623,863 tons of crude ore from its Ottawa County operations. The processing of this ore resulted in about 1,558,908 tons of tailings disposed in and around the Picher-Cardin area, including 194,863 tons of sand-sized tailings, 129,909 tons of flotation tailings, and 1,299,090 tons of chat tailings.

12.    Defendant NL Industries is a New Jersey Corporation. NL Industries conducted mining and milling operations in and around the Picher-Cardin area as the St. Louis Smelting and Refining Company from 1917 through 1944. According to the records of the U.S. Bureau of Mines, NL Industries produced 2,381,694 tons of crude ore from its Ottawa County operations. The processing of this ore resulted in 2,286,426 tons of tailings disposed in and around the Picher-Cardin area, including 285,803 tons of sand-sized tailings, 190,535 tons of flotation tailings, and 1,905,355 tons of chat tailings.

13.    Defendant, Ore & Mineral Recovery, Inc. ("OMR") is a Nevada Corporation with its principal place of business in Oklahoma. OMR owns property in Ottawa County on which chat piles and/or tailings ponds currently exist and has used and/or benefited from the chat piles and/or tailings ponds in its business operations.

14.    Defendant, RJJ, Inc. ("RJJ") is an Oklahoma Corporation. RJJ owns property in Ottawa County on which chat piles and/or tailings ponds currently exist and has used and/or benefited from the chat piles and/or tailings ponds in its business operations.

IV.    FACTUAL ALLEGATIONS

    A.    Historical Mining Operations in the Picher Mining Field Deliberately Contaminated the Environment Where Plaintiffs Reside.

15.    Mining in Ottawa County began in the early 1900's and continued until the 1970's. Lead and zinc ore were discovered, and mining operations began near Quapaw and Commerce on the Site as early as the 1900s. In 1914, the Oklahoma portion of the Tri-State Mining District underwent a major expansion because of a large discovery of lead deposits near the present site of the towns of Picher and Cardin. Following this discovery,

there was a vast expansion of mining activities in what became known as the Picher Mining Field.

16.     After 1919, the bulk of the ore from the Tri-State Mining District came from the Picher Mining Field. The Picher Mining Field reached maximum development in the 1920s. Production in this field increased dramatically during both World War I and World War II to meet the Nation's urgent need for war materials. While there were several periods of reduced mining activity because of reduction in metal prices, some mining in Ottawa County occurred more or less continually until the 1970s.

17.     The milling of ore at Picher Field produced large quantities of tailings. These tailings were typically disposed of next to the mill that produced them. The coarsest tailings ("chat") along with the intermingled sand-sized tailings were typically disposed of in a pile on the site by means of an elevator or a belt conveyor. These chat piles were a waste product of the gravity concentration process used by the mining companies. Another process involving flotation produced finer tailings that were typically pumped into a "tailing pond." Such a pond would evaporate, leaving sediment consisting of these tailings.

18.     The chat piles had commercial uses and were often sold as railroad ballast, concrete aggregate, and fill for roads. In order to facilitate this use, the chat piles were often moved around the mining site, with no regard for the safety of nearby residents.

19.     In 1986, the Oklahoma Geological Survey estimated that approximately 70 million tons of coarse tailing remained at the Tar Creek Site. That constituted almost 42 percent of the chat that was produced in the Picher Mining Field. This figure does not include the millions of tons of fine tailings left as sediment from the floatation process.

20.    Each mining Defendant made vast profits from their operations in the Picher Field. Likewise, Defendants OMR and RJJ profited from the sale and distribution of the chat and spread the toxic materials to suit their own commercial needs. As a result, the residents of the Picher-Cardin area are left with the legacy of the Defendants' greed and communities that literally surround these huge chat piles.

B.    **Defendants' Actions Expose the Infant Plaintiffs to Dangerously High Levels of Lead on a Daily Basis.**

21.    Lead is a toxin. There is no known safe level of ingestion or absorption below which no adverse human health effect is ensured. The U.S. Department of Housing and Urban Development and the EPA noted the following in a March 1996 regulation:

> Lead affects virtually every system of the body. While it is harmful to individuals of all ages, lead exposure can be *especially damaging to children, fetuses, and woman of childbearing age* . . .
>
> * * *
>
> Lead poisoning has been called "the silent disease" because its effects may occur gradually and imperceptibly, often showing no obvious symptoms. Blood levels as low as 10 ug/dL [micrograms deciliter] have been associated with learning disabilities, growth impairment, permanent hearing and visual impairment, and other damage to the brain and nervous system. In large doses, lead exposure can cause brain damage, convulsions, and even death.

(Emphasis added).

22.    Historically, the federal government has taken the position that that lead poisons the brain even in very small quantities – as low as 10 micrograms per deciliter of blood. Children with blood lead levels of 10 micrograms per deciliter and higher show reduced short-term memory, delayed reaction time, reduced ability to concentrate and

diminished IQs. Conservative estimates now indicate that an average IQ drop of six points in an exposed population can be explained by lead poisoning.

23.    Current and developing scientific studies trace cognitive impairment in children with blood lead levels well below the historic 10 micrograms per deciliter level. For example, a study by Bruce Lanphear of Children's Hospital Medical Center in Cincinnati found a link between cognitive impairment, especially lower reading ability, in children with blood lead levels as low as 2.5 micrograms per deciliter. There were also declines in the scores for visual construction skills and short-term memory. Dr. Lanphear proposed that the current federal threshold of 10 mcg/dcl be cut by at least half.

24.    The preponderance of public health and scientific studies demonstrate that low-level lead exposure has insidious effects on brain function, such as lowered intelligence and diminished school performance, especially from exposures that occur in early in life; hearing deficits and growth retardation have also been observed.

25.    Children with elevated lead concentrations are likely to show substantially decreased school performance that can require reading or speech therapy or the attention of a school psychologist. Such decreased performance leads to lower IQs. Infants and children ingest lead-contaminated dust and soil through normal mouthing behaviors. In the second year of life, as children begin to play outdoors, it is normal for children to put dirt or soil in their mouths.

26.    In a 1996 report, the EPA found that children are particularly at risk from environmental hazards in three ways:

  i.    Because children's systems are still developing – including rapid changes in growth and development, immature body organs and tissues, and weaker immune systems in infancy – they are more susceptible to environmental threats.

8

  ii. Because children eat proportionately more food, drink more fluids, and breathe more air per pound of body weight, and because they play outside more, they are more exposed to environmental threats.

  iii. Because children are least able to protect themselves, their behavior - such as crawling on the ground or the floor – exposes them to different environmental hazards.

27. The infant Plaintiffs reside within a community surrounded by over 50 Million tons of this toxin. As a result, Plaintiffs have been exposed to lead at home, school, playgrounds and other recreational areas on a daily basis.

## V. CAUSES OF ACTION

### FIRST CAUSE OF ACTION: NEGLIGENCE

28. Plaintiffs adopt the allegations contained in paragraph 1 through 27, inclusive, as if fully set forth herein.

29. Defendants had a duty to exercise reasonable care in the disposal of potentially toxic materials, specifically the lead wastes, from their respective mining activities. Defendants failed to exercise reasonable care in where lead wastes were placed, the proximity of lead wastes to inhabited areas, securing lead wastes from spreading to the air, soil and water in the surrounding area and barring access to lead wastes areas. Defendants knew or should have known that these unsecured wastes would migrate into the soil, air and water of the surrounding properties and become a health hazard for residents of the surrounding areas.

32. As a direct and proximate result of Defendants' negligence as described herein, Plaintiffs have sustained lead poisoning for which Defendants are jointly and severally liable.

9

33.   As a direct and proximate result of Defendants' actions as described herein, Plaintiffs have suffered and will continue to suffer mental, physical and emotional injuries, which are debilitating and permanent in nature.

34.   As a direct and proximate result of Defendants' actions as described herein, Plaintiffs will incur medical expenses in the future for treatment of their mental, physical and emotional injuries.

35.   As a direct and proximate result of Defendants' actions as described herein, Plaintiffs have suffered an impairment of earning capacity.

## SECOND CAUSE OF ACTION: STRICT LIABILITY

36.   Plaintiffs adopt the allegations contained in paragraph 1 through 35, inclusive, as if fully set forth herein.

35.   Defendants' disposal of hazardous substance, *i.e.* lead, constituted an abnormally dangerous activity that caused injury to Plaintiffs.

36.   There has been and continues to be injury to Plaintiffs' health from the presence of hazardous substances deposited by Defendants in quantities harmful to the public health and welfare.

37.   The discharge of hazardous substances by Defendants has caused and continues to cause injury to Plaintiffs as described above.

38.   Defendants are jointly and severally liable to Plaintiffs for injuries suffered as a result of Defendants' abnormally dangerous activity of disposing of lead mining wastes. 39.   Defendants are strictly liable for all damages.

10

## THIRD CAUSE OF ACTION: NUISANCE

40.  Plaintiffs adopt the allegations contained in paragraph 1 through 39, inclusive, as if fully set forth herein.

41.  The past, present and/or continuing conduct of Defendants, and each of them, by depositing onto and not removing, lead contaminants from the property where Plaintiffs reside, constitutes a private nuisance that is specifically and generally injurious to the health and offensive to the sense of Plaintiffs, and specifically interfered with, unlawfully obstructed and disturbed the comfort, use and enjoyment of the property upon which Plaintiffs reside.  These nuisances are ongoing and are not abatable.

42.  There has been and continues to be injury to Plaintiffs who reside on the effected properties from the disposal of hazardous substances by Defendants in quantities harmful to the public health and welfare.

43.  The disposal of hazardous substances by Defendants has caused and continues to cause injury to Plaintiffs as described above.

44.  Defendants are jointly and severally liable to Plaintiffs for any injuries resulting from the presence of the hazardous mining wastes.

45.  In the alternative, Defendants' disposal of tailings in residential areas violates Federal and State standards and/or regulations, which constitutes nuisance *per se*.

## FOURTH CAUSE OF ACTION: ATTRACTIVE NUISANCE

46.  Plaintiffs adopt the allegations contained in paragraphs 1 through 45, inclusive, as if fully set forth herein.

47.  Defendants' actions caused artificial conditions to exist in the area surrounding Picher-Cardin, *i.e.*, the chat piles.

11

48.    The Defendants knew or should have known that the chat piles created from their mining wastes were located in a place where children are likely to recreate.

49.    The Defendants knew or should have known that these piles of lead mining wastes involved an unreasonable risk of injury to children who would have contact with the piles.

50.    The infant Plaintiffs were not aware of the risk involved in their direct contact with the chat piles and therefore recreated on or near the toxic lead.  There is little utility, if any, in Defendants' placement of these chat piles in a residential area and any such utility would be far outweighed by the risk to children, such as Plaintiffs, who recreate on or near the Defendants failed to exercise reasonable care to bar access to these chat piles and otherwise eliminate the danger to children, like Plaintiffs, who recreate at or near the toxic lead.

52.    Defendants' placement of these unguarded chat piles has caused and continues to cause injury to Plaintiffs as described above.

53.    Defendants are jointly and severally liable to the infant Plaintiffs for any injuries resulting from the placement of these unguarded chat piles throughout the area where they recreate.

## VI.    DEMAND FOR TRIAL BY JURY

54.    Plaintiffs demand a trial by jury on all issues triable before a jury.

## VII.  PUNITIVE DAMAGES

55.    The conduct of Defendants in the disposal, placement and securing of the toxic lead waste from their respective mining operations, as well as the failure of

Defendants to correct the hazardous conditions created by their actions, constitutes malice and/or willful conduct, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly Plaintiffs. Said action warrant the imposition of punitive and/or exemplary damages.

### VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against all Defendants, jointly and severally, on the grounds set forth in Causes of Action for negligence, strict liability, nuisance and/or attractive nuisance, in the amount of Twenty Million Dollars ($20,000,000) in compensatory damages, and Twenty Million Dollars ($20,000,000) in punitive damages, plus costs and attorneys' fees, and for such other and further damages and relief as this Court may deem appropriate.

Respectfully submitted,

By:

Tony W. Edwards, OBA #2649
Anthony Laizure, OBA #5170
STIPE LAW FIRM
P.O. Box 1369
McAlester, OK  74502-1369
(918) 423-0421

Christopher A. Seeger
Christopher J. Murray
SEEGER, WEISS LLP
One William Street
New York, NY  10004-2502

Charles F. Speer
PAYNE & JONES, CHTD.
11000 King
P. O. Box 25625
Overland Park, KS 66225-5625
(913) 469-4100

13

Robert F. Kennedy, Jr.
Kevin J. Madonna
Kennedy & Madonna, LLP
109 Mountain Laurel Lane
Woodstock, NY 12498
845-679-0259

ATTORNEYS FOR PLAINTIFFS

