UNITED STATES BANKRUPTCY COURT FOR THE
SOUTHERN DISTRICT OF OHIO, WESTERN DIVISION

| | |
|---|---|
| In Re: | Consolidated Case No. 1-91-10100 |
| EAGLE-PICHER INDUSTRIES, INC., *et al.*, | Chapter 11 |
| Debtors. | Hon. Mina Nami Khorrami, U.S.B.J. |

**ANNUAL REPORT AND ACCOUNT
OF THE TRUSTEES OF THE EAGLE-PICHER INDUSTRIES, INC. PERSONAL
INJURY SETTLEMENT TRUST FOR THE YEAR ENDING DECEMBER 31, 2025**

Purpose of Report

Laura R. Walker (Chairperson) and Christopher K. Kiplok, as Trustees of the

Eagle-Picher Industries, Inc. Personal Injury Settlement Trust (the "Trust"), respectfully submit

this annual report and account (the "Report") in compliance with Sections 3.2(c) and 5.12 of the

Eagle-Picher Industries, Inc. Personal Injury Settlement Trust Agreement (the "Trust

Agreement") and this Court's Order Regarding Accountings of the Eagle-Picher Industries, Inc.

Personal Injury Settlement Trust dated March 14, 1997 (the "Order").[1]

Section 3.2(c) of the Trust Agreement provides:

(c)     The Trustees shall cause to be prepared and filed with the
Bankruptcy Court, as soon as available, and in any event within one hundred
twenty (120) days following the end of each fiscal year, an annual report
containing (1) financial statements of the PI Settlement Trust (including,
without limitation, a balance sheet of the PI Settlement Trust as of the end
of such fiscal year and a statement of operations for such fiscal year) audited
by a firm of independent certified public accountants selected by the
Trustees and accompanied by an opinion of such firm as to the fairness of
the financial statements' presentation of the cash and investments available
for the payment of claims and as to the conformity of the financial

---

[1]  As discussed further below, Stephen A. Madva retired as a Trustee effective December 31,
2025, after over a decade of service to the Trust.  Where this Report refers to the "Trustees," it
means Trustees Madva, Walker, and Kiplok during the period from January 1, 2025 through
December 31, 2025, and Trustees Walker and Kiplok for the period from January 1, 2026
through the date of this Report.

statements with generally accepted accounting principles and (2) such other matters as the Trustees deem appropriate to report to the Bankruptcy Court. The Trustees shall provide a copy of such report to the TAC and to Reorganized Eagle-Picher.

(i)     Simultaneously with delivery of each set of financial statements referred to in Article 3.2(c) above, the Trustees shall cause to be prepared and filed with the Bankruptcy Court a report containing a summary regarding the number and type of claims disposed of during the period covered by the financial statements.

(ii)    All materials required to be filed with the Bankruptcy Court by this Article 3.2 shall be available for inspection by the public in accordance with procedures established by the Bankruptcy Court.

Section 5.12 of the Trust Agreement provides:

5.12.    Settlement of Trustees' Accounts.  Notwithstanding any state law to the contrary, the Bankruptcy Court shall have exclusive jurisdiction over the settlement of the accounts of the Trustees, whether such account is rendered by the Trustees themselves or is sought by any other person.  The Trustees shall render successive accounts covering periods ending at the end of each calendar year consisting of the filings required by Article 3.2(c) of this Trust Agreement.  In addition, an account shall be rendered for the period ending on the date of the . . . retirement of any Trustee.  Upon the approval of any such account by the Bankruptcy Court after hearing on notice to Reorganized Eagle-Picher, the TAC and such other parties as the Bankruptcy Court may designate, the Trustees shall be discharged from any further liability or responsibility, as to all matters embraced in such account.

Paragraph (a) of this Court's Order, reads, in pertinent part:

(a)     The Accounting required of the Trust for each successive calendar year shall consist of the annual report and the claims summary required under Sections 3.2(c) and 3.2(c)(i) of the Trust Agreement, together with any further information the Trustees may deem appropriate to provide the Court, plus an application for approval of the Accounting and discharge of the Trustees, and a proposed order (the "Materials").  These Materials shall be filed no later than April 30 of each year.

The principal purposes of this Report and the accompanying year-end audited

financial statements are to inform the Court, the Trust's beneficiaries, and other interested parties

of the actions taken and decisions made by the Trustees during the year-ended December 31,

2025, and to provide a basis, under Section 5.12 of the Trust Agreement, for the discharge from

2

liability of the Trustees for all matters included in this Report or otherwise embraced by the account.

<u>Jurisdiction</u>

The Court has jurisdiction over the Application for Order Approving Annual Report and Account pursuant to Section 9.1 of the Plan of Reorganization.

<u>Summary</u>

Under this Court's supervision, the Trust has received more than 717,000 claims over the past 28 years. In 2025, through the Trust's ownership of the Claims Processing Facility, Inc. ("<u>CPF</u>"), the Trust (i) received a total of 7,197 asbestos-disease claims; (ii) processed to allowance or disallowance a total of 8,216 initial asbestos-disease claims; (iii) processed 2,560 disallowance responses; and (iv) made payments to asbestos victims or their survivors totaling approximately $22 million. From inception through December 31, 2025, the Trust distributed more than $966 million to victims of asbestos disease or their survivors.

During 2025, the Trustees, the Trust's senior management team, and the Trust's investment advisor held four regular quarterly meetings, and also held one annual investment meeting, to monitor the management of the portfolio. At year-end, the Trust's net assets were valued at approximately $259 million.

As of December 31, 2025, the Trust's current assets and past distributions totaled over $1.2 billion, from an initial Trust corpus of approximately $730 million. This achievement is a testament to the Trust's governing documents, the Trustees' sound management, and this Court's ongoing oversight.

4911-1500-2781.3

## I. Meetings of the Trustees

During 2025, the Trustees held four regular meetings, one Audit Committee meeting, four IT Steering Committee meetings, and one investment managers meeting. The Trust's Executive Directors, Trustees' Advisory Committee ("TAC") members, the Trust's investment advisor (Cambridge Associates LLC), and the Trust's tax advisor (Deloitte Tax LLP) participated in all of the regular meetings, which were conducted virtually. The CPF's IT Steering Committee held four separate virtual meetings, which Trustee Madva attended as a representative of the Trust and CPF's board of directors.

## II. Trust Administration

### A. The Trustees, Mr. Madva's Retirement as of December 31, 2025, and the Trustees' Motion to Amend the Trust Agreement and Bylaws

The Trustees continued to retain CohnReznick as auditors for the Trust and CPF. CohnReznick has significant experience auditing section 524(g) trusts, asbestos trust financial statements, asbestos personal injury claims, and IT security controls. The Trustees also continued to retain Deloitte Tax LLP as tax consultant and Marsh USA as insurance broker.

Throughout 2025, Teena Mandele continued in her roles as the Trust's Executive Director and as the President of the CPF, the Trust's wholly-owned subsidiary.

Through December 31, 2025, the Trustees continued to serve as directors of the CPF and spent time individually on numerous Trust matters during the course of the year. For example, among other activities:

- Mr. Madva continued as Chairperson of the Trust and CPF, and in that role devoted significant time to management of the Trust, and to communicating with the Trust's investment advisor, investment managers, and counsel. Mr. Madva also worked with the Trust's Executive Director and CPF staff on the Trust's and CPF's insurance programs and the CPF's IT Steering Committee to help guide the vision, policy, security and budget for IT development for the Trust and CPF.

4911-1500-2781.3

- Ms. Walker continued as Chairperson of the Audit Committee, and devoted significant time to continued collaboration with the Trust's professional staff, investment advisor, investment managers, and counsel on the prudent management of the Trust, the Trust's assets, and the CPF.

- Mr. Kiplok devoted significant time to monitoring developments with respect to litigation and bankruptcies involving companies with significant asbestos-related personal injury liabilities and to considering how such litigations and bankruptcies might potentially affect the Trust and to communicating with the Trust's investment advisor and investment managers.

After over a decade of dedicated service to the Trust, Mr. Madva reached mandatory retirement age in 2025 and thus, as required by the Trust Agreement, retired as a Trustee effective December 31, 2025.

Throughout 2025, the Trustees worked collaboratively to prepare for Mr. Madva's retirement, which occasioned the transition of Mr. Madva's responsibilities as Chairperson of the Trust and CPF to Ms. Walker. In close consultation with the TAC, the Trustees also discussed the Trust's succession planning and its expected governance needs following Mr. Madva's retirement. Informed by such consultations, the Trustees developed a list of potential candidates to succeed Mr. Madva and interviewed a number of highly qualified candidates. In parallel, the Trustees considered whether the Trust's current governance structure of three Trustees continued to match the Trust's needs, which have evolved in the thirty years since the Trust's inception, and also whether any amendments to the Trust Agreement might be warranted to afford the Trust sufficient flexibility to modify its governance arrangements in the future to enable the Trust to respond to changing circumstances.

Following such deliberations and consultations with the TAC, the Trustees reached the conclusion that the Trust's current governance needs can be ably met by fewer than three Trustees and that governance by fewer than three Trustees would promote meaningful cost savings to the Trust without impairing the Trustees' oversight and administration of the Trust.

4911-1500-2781.3

Accordingly, the Trustees have moved this Court for permission to amend the Trust Agreement and Trust Bylaws to reduce the number of required Trustees from three to "at least one, and no more than three." (*See* ECF No. 7117.) This application, if granted, would align the Trust's governance with that of many other asbestos personal injury trusts—including both emerging trusts and long-existing trusts, as well as trusts both larger and smaller than the Trust—that are governed by fewer than three trustees. It would also give the Trustees the flexibility to increase the number of trustees back to three if warranted by the circumstances and allow the Trust to proceed under the oversight of a single trustee in its sunset years, when claim volumes decline and the Trust begins to wind down its operations.

B. Processing Fee

As the Trust reported in its 2021 annual report (ECF No. 7013), the Trust in February 2021 instituted a $100 claim processing fee to be paid by all claimants except *pro se* claimants. The Trust fully refunds the claim processing fee to holders of valid claims. The Trust did not change any policies or practices regarding the processing fee during 2025.

The initial disallowance rate for claims filed with the Trust has declined significantly since the Trust instituted the claim processing fee. Before the Trust instituted the processing fee, initial disallowance rates were often over 50%. In 2025, the initial disallowance rate was 41%. The principal reason for initial disallowances continues to be that claimants' proofs of exposure to Eagle-Picher asbestos-containing products do not comply with the requirements of the Trust's Claims Resolution Procedures.

C. Payment Percentage

The Trust's Payment Percentage is the percentage to be paid on allowed individualized review claims. Section IV of the Claims Resolution Procedures requires the

4911-1500-2781.3

Trustees to re-consider at least every three years whether any adjustment to the Payment Percentage is appropriate to maintain the Trust's ability to substantially comply with the Trust's requirement that it treat present and future claimants as equitably as possible.

As discussed in the 2023 and 2024 annual reports (ECF Nos. 7052 and 7097), the Trustees last reassessed the Payment Percentage in 2023, and effective November of that year, they approved a forward-looking increase of the Payment Percentage from 33% to 35%. This was the first adjustment to the Payment Percentage since November 2015, and relied on the findings of an actuarial study conducted by the Trust's expert consultant, Ankura Consulting Group, LLC, and on considerations including the Trustees' evaluation of current information regarding claim filing trends, settlement values, asset performance, operating costs, and other factors that determine what fraction of the settlement value of each allowable claim the Trust can afford to pay. This decision was made in consultation with the TAC.

The Trustees monitor the Trust's performance, operations, and claim trends on an ongoing basis to evaluate whether an adjustment to the Payment Percentage should be considered based on the factors set forth above and any others that may be relevant. Consistent with Section IV of the Claims Resolution Procedures, the Trustees will conduct their next formal review of the Payment Percentage in 2026.

D.     Asbestos-Related Litigation

The Trust continued to monitor developments in the progress of several asbestos-related litigations, including some bankruptcies that resulted in, or that are expected to result in, the creation of new section 524(g) trusts.[2] The Trust also continued to monitor proposed

---

[2] As of December 31, 2025, such asbestos-related bankruptcies included *In re Bestwall LLC*, No. 17-31795 (Bankr. W.D.N.C.); *In re Aldrich Pump LLC*, No. 20-30608 (Bankr. W.D.N.C.);

4911-1500-2781.3

legislation related to asbestos personal injury litigation and trusts established under section 524(g).

The Trustees and Trust management are following these litigation and legislative developments because they may affect the cost of Trust administration through the subpoena burden faced by the Trust and through the cost of additional reporting. Indeed, even without the impact of potential legislative changes, the Trust responded to approximately 34 third-party subpoenas during 2025. The subpoenas largely sought claims filing information and were primarily issued by asbestos defendants. In most instances, the Trust responded to properly issued subpoenas by providing, after giving notice to the claimants, copies of claimants' claim forms. Generally, the Trust received reimbursement for the costs and expenses it incurred responding to the subpoenas. Consistent with the Trust's long-standing policy, the Trust did not divulge any medical information or settlement amounts in responding to these subpoenas, and, to the extent that any of the subpoenas requested such information, the Trust took action to quash or otherwise oppose the request.

E.  Lead Litigation

The Trust Agreement provides that the Trustees "shall promptly educate and inform themselves as to Lead Personal Injury Claims that may be asserted" against the Trust. Accordingly, the Trustees continue to actively monitor litigation against lead pigment manufacturers. Currently there is no state in which holders of Lead Personal Injury Claims, as defined in the Trust Agreement, have obtained a final, non-appealable judgment against a lead pigment manufacturer. Therefore, as the Trustees have previously reported to the Court, it

---

*In re Imerys Talc America, Inc.*, No. 19-10289 (Bankr. D. Del.); *In re Cyprus Mines Corp.*, No. 21-10398 (Bankr. D. Del.); and *In re DBMP LLC*, No. 20-30080 (Bankr. W.D.N.C.).

4911-1500-2781.3

remains very unlikely that the Trustees will be required to estimate the Trust's possible liability for, or to decide whether to reserve funds or otherwise maintain resources for the payment of, Lead Personal Injury Claims.

## III.    Asset Management

### A.    *Investment Allocation*

The Trust continued to implement the investment strategy developed over time in reliance on the advice of Cambridge Associates LLC.  The Trust's invested assets are allocated among three portfolios: (1) a total-return bond portfolio composed primarily of intermediate-term tax-exempt bonds, with up to 10% of the portfolio in below-investment-grade fixed income securities; (2) an equity portfolio composed of shares of U.S. companies with medium-to-large capitalization benchmarked to the Russell 1000 Index; and (3) an equity portfolio composed of American Depository Receipts representing ownership interests in securities of approximately 150 large capitalization companies in developed markets outside the United States, benchmarked to the Standard & Poor's ADR Index.

Upon the advice of the Trust's investment advisor, the Trust's investment allocation during 2025 was 46.2% intermediate-term bonds, and 53.8% equities.  The Trustees, in consultation with the Trust's investment advisor, management team, and other professional advisors, continuously review the Trust's investment allocations to assess whether any adjustment is appropriate in light of the Trust's current circumstances, market conditions, and other relevant factors.

Throughout 2025, the Trust continued to retain The Northern Trust Company to manage the Trust's equity investments and Insight Investments to manage the Trust's

4911-1500-2781.3

intermediate-term bond portfolio.  The Trust also continued to retain The Northern Trust Company as custodian of all of the Trust's investment accounts.

## B.  *Investment Performance*

The Trust's investment returns over the past three years were:

|  | 2025 | 2024 | 2023 |
|---|---|---|---|
| Short-term bond portfolio[3] | - | 1.8% | 3.1% |
| Intermediate-term bond portfolio | 5.4% | 0.8% | 5.8% |
| Equity: | | | |
| Russell 1000 Index portfolio | 17.9% | 23.7% | 26.5% |
| S&P ADR Index portfolio | 35.7% | 9.4% | 20.3% |
| | | | |
| **Total Return** | **15.6%** | **8.4%** | **13.1%** |

The Trust's bond portfolio is almost entirely invested in tax-exempt bonds, meaning that the investment returns for its bonds are after-tax returns.  The equity portfolios managed by The Northern Trust Company replicate indices, and the 2025 returns of the portfolios closely tracked the 2025 returns of those indices, which were 17.4% for the Russell 1000 Index and 36.6% for the S&P ADR Index.

## IV.  Claims Processing

### A.  *Claim Filing Options*

Trust claimants have the option to file either a Discounted Cash Payment ("DCP") claim or an Individualized Review ("IR") claim.  The DCP option is designed, in part, for claimants whom the Trust can easily determine have a valid non-malignant injury claim and who

---

[3]  As the Trust previously reported to the Court (*see* ECF No. 7097, at 10-11), the Trust, in consultation with its investment advisor, wound down its short-term bond portfolio as of December 31, 2024.  The Trust used the proceeds of the sale of its short-term bonds as the principal funding source for its 2024 obligations, including payments to qualifying beneficiaries. By consolidating the Trust's bond portfolio under a single investment manager (Insight Investments), the Trust reduced its operational expenses.

wish to receive an initial fixed payment, which is subject to a limited release and allows the claimant to retain the right to receive an additional payment if the claimant is subsequently diagnosed with an asbestos-related malignancy.  The DCP option is also available for claims for a malignant injury using a fixed payment schedule.  The DCP payment schedule allows for one-time payments as follows:

| Mesothelioma | $6,500 |
|---|---|
| Lung Cancer | $2,000 |
| Other Cancer | $1,000 |
| Non-Malignant | $400 |

IR claims are reviewed using tort system principles and a confidential, proprietary claim valuation model.  This option is available for all disease categories.  Any claimant who elects the IR settlement option must release the Trust from all past, present, and future claims arising from exposure to Eagle-Picher asbestos-containing products.  The Trust has advised claimants' counsel that, based on current facts and circumstances, including the Trust's current payment percentage, the IR claim option will generally result in a higher payment for malignancies than the DCP option.

### B.      *Claims Processing Results*

The CPF, on behalf of the Trust, received a total of 7,197 individual personal injury claims in 2025, of which 584 were DCP claims and 6,613 were IR claims.  Claims filed or received over the past three years were as follows:

|  | 2025 | 2024 | 2023 |
|---|---|---|---|
| **Total claims received** | **7,197** | **8,047** | **5,519** |
| Discounted Cash Payment | 584 | 1,605 | 398 |
| Individualized Review | 6,613 | 6,442 | 5,121 |

4911-1500-2781.3

The ratio of non-malignant to malignant claims filings was approximately 3.18 to 1 in 2025, compared to: 3.66 to 1 in 2024, 2.25 to 1 in 2023, 1.84 to 1 in 2022, 1.13 to 1 in 2021, 1.07 to 1 in 2020, 1.55 to 1 in 2019, and 4.36 to 1 from inception through December 31, 2025. Approximately 62% of all dollars paid in 2025 went to claimants with malignant diseases.

During 2025, the CPF processed a total of 8,216 claims to allowance or initial disallowance. There were 1,307 claims that remained unprocessed at year end. The Trust paid approximately $22 million in 2025 to asbestos victims in settlement of their claims.

As of December 31, 2025, the CPF, on behalf of the Trust, had received a total of 717,899 individual asbestos personal injury claims since inception. Of the 717,899 claims, the CPF had processed to allowance or initial or final disallowance 716,592 claims, in addition to 1,373 Trust-processed prepetition settled claims. To date, the Trust has paid a total of approximately $966.2 million on allowed claims.

### 1. Discounted Cash Payment Claims

During 2025, the CPF, on behalf of the Trust, received 584 DCP claims and processed 991 of those claims to allowance or initial disallowance. Upon initial review, the CPF allowed approximately 23% of DCP claims and initially disallowed approximately 77%. Claimants have one year following initial disallowance to correct any deficiency in their claim. During 2025, the Trust paid a total of approximately $376,000 on allowed DCP claims, bringing the total that the Trust has paid to claimants on DCP claims over its lifetime to $129,732,200.

### 2. Individualized Review Claims

During 2025, the CPF, on behalf of the Trust, received 6,613 IR claims and processed 7,225 IR claims to allowance or initial disallowance. Upon initial review, the CPF allowed approximately 62% of IR claims and initially disallowed approximately 38%. As noted

4911-1500-2781.3

above, claimants have one year following initial disallowance to correct any deficiency in their claim. During 2025, the Trust paid a total of $21,682,035 on allowed IR claims, bringing the total that the Trust has paid to claimants on IR claims over its lifetime to $832,361,708.

### C. *Alternative Dispute Resolution*

No claimants elected Alternative Dispute Resolution during 2025.

### D. *The CPF*

The Trustees continued to serve as the directors of the CPF. The Trustees are not compensated for their service as CPF directors, but they are entitled to hourly or *per diem* compensation for work performed outside of CPF board and committee meetings. As of the date of this Report, the Trustees have not received any compensation for their service as CPF directors.

In addition to processing the Trust's claims, the CPF continues to process claims on a contract basis for the Keene Creditors Trust, the Raytech Corporation Asbestos Personal Injury Settlement Trust, the UGL Trust, the Bondex Trust and its subfund NMBFiL Trust, the Fairbanks Asbestos Personal Injury Trust, the Mallinckrodt Asbestos Personal Injury Trust, and the HONX Asbestos Trust. The CPF has also contracted with the Bondex Trust and its subfund, NMBFiL, to provide certain accounting and budgeting services that are similar, although more basic in format, to the services that the CPF provides to the EPI Trust.

The Trustees closely monitor the CPF's activities and results, including the average cost for the CPF to process claims for the Trust and CPF's client trusts. CPF seeks to provide high-quality, efficient claims processing services for the Trust and all of the CPF's client trusts, and through efficiencies of operations and scale is able to reduce claims processing costs for the Trust as well as the CPF's client trusts.

4911-1500-2781.3

The Trustees and the CPF continue to actively monitor any bankruptcy filings that may result in the creation of section 524(g) trusts for the purpose of evaluating potential new business opportunities for the CPF. Whether and when CPF might realize new business from any newly formed section 524(g) trusts is uncertain. Relative to historical experience, it has been taking increasingly long for new section 524(g) trusts to emerge from the bankruptcy process, limiting the CPF's opportunities for new business. In addition, the CPF continues to face competition from other claims processing facilities.

## V.      Cost Control

The Trustees and the CPF continually look for ways to reduce the Trust's costs while enhancing the quality of claims processing. Trust operating expenses of $3.6 million in 2025 were approximately even with the Trust's operating expenses during 2024, and approximately $250,000 under budget. Approximately 58% of all operating expenses are attributable to claims processing. Claims processing expenses totaled $2.08 million in 2025, $2.01 million in 2024, $2.4 million in 2023, $2.9 million in 2022, and $2.96 million in 2021.

## VI.     Financial Statements

The Trust's audited financial statements for the year ended December 31, 2025 are attached as Exhibit A hereto and the CPF's audited financial statements for the year ended December 31, 2025 are attached as Exhibit B hereto.

Dated: New York, New York  
      April 29, 2026

_____s/ Laura R. Walker_____  
Laura R. Walker, Trustee (Chairperson),  
for herself and for Trustee  
Christopher K. Kiplok

4911-1500-2781.3